# In the United States Court of Federal Claims

No. 24-2028
(Filed Under Seal: June 2, 2025)
Reissued: June 12, 2025*

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                          *
                                          *
KL3, LLC,                                 *
                                          *
                Plaintiff,                *
                                          *
        v.                                *
                                          *
THE UNITED STATES,                        *
                                          *
                Defendant,                *
                                          *
and                                       *
                                          *
SUVI GLOBAL SERVICES LLC,                 *
                                          *
                Defendant-Intervenor.     *
                                          *
                                          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Erica L. Bakies*, argued for Plaintiff, with whom were *Adam K. Lasky*, counsel of record, and *Ryan C. Gilchrist*, Seyfarth Shaw LLP, all of Seattle, WA, for Plaintiff.

*An Hoang*, Trial Attorney, with whom were *Corinne A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, and *Yaakov M. Roth*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, all of Washington, D.C., for Defendant, and *Brandon Goswell*, Assistant General Counsel, Washington Headquarters Services & Pentagon Force Protection Agency, Office of General Counsel, Department of Defense, of Washington, D.C., of counsel.

*Adam A. Bartolanzo*, with whom were, *C. Peter Dungan*, *Alfred M. Wurglitz*, *Cash W. Carter*, and *Mitchell D. Dolman*, Miles & Stockbridge PC, all of Washington, D.C., for Defendant-Intervenor.

---

* Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion.  In addition, the Court made minor typographical and stylistic corrections to this version of the opinion.

**OPINION AND ORDER**

**SOMERS,** Judge.

In order to successfully protest a government procurement, a protestor must demonstrate that the government agency committed an error in conducting the procurement at issue and that the error prejudiced the protestor.  Although both of these requirements must be met, protestors regularly focus (sometimes exclusively) their protest pleadings and briefing on the former requirement, ignoring the equally important prejudice requirement.  Many times, this strategy works as the prejudice created by an agency's error is readily apparent.  *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) ("Often the circumstances of the case will make clear [that the error] . . . was harmful and nothing further need be said.").  But in instances in which the alleged prejudice caused by the error is not obvious, failure to allege in the complaint and then prove prejudice on the merits is fatal to a protestor's case.  As will be explained in detail below, prejudice in the instant protest falls into this non-obvious category and is fatal to the protestor's case.

Despite the fatal ending to which failure to plead and prove prejudice in a bid protest leads, this is by far not the first time a protestor has offered only conclusory allegations and statements regarding prejudice in both its complaint and briefing on its motion for judgment on the administrative record.  The Court is not sure if this failure to plead and prove how an error is harmful to the protestor is the result of protestors believing the errors they allege are so obviously prejudicial (even if they are not) that there is no need to allege or prove them or whether protestors simply think that prejudice is some technicality that a judge will fill in for them if an error has been proved.  But filling in allegations and proof of a necessary component of a bid protest is neither a judge's job nor even an appropriate task for a judge in our adversarial system of justice.  Simply put, a protestor bears the burden of plausibly alleging in its complaint that an agency not only committed an error in the procurement process but that this error caused the protestor harm.  Then, on the merits, it must prove *both* of these allegations.

In the instant protest, KL3, LLC ("KL3") challenges the set aside of two information technology contracts offered through the Small Business Administration's ("SBA") 8(a) business development program to Defendant-Intervenor Suvi Global Services LLC ("Suvi").  According to KL3, neither of the contracts in question were eligible for transfer to the 8(a) program because the requirements had previously been solicited as a small business set aside, which was cancelled.  For various reasons, KL3 argues that this previous small business designation makes the sole source, 8(a) set aside to Suvi arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  While the parties spend most of their briefing discussing the errors KL3 alleges, the government raises—and the Court will focus on—the issue of whether KL3 alleged that it was harmed by those errors and, secondarily, whether it proved on the merits that the errors alleged were prejudicial.

## BACKGROUND

**A.    Predecessor Requirements:  Legacy ITSS and ENCORE III**

Beginning in 2017, the Department of Defense's Office of the Inspector General ("DoD OIG") contracted with LinTech Global, Inc. ("LinTech"), a large business and mentor to KL3, to provide information technology support services ("ITSS"), known as the Legacy ITSS contract. Tab 92a at Administrative Record ("AR") 2841; ECF No. 46 ¶ 6; Tab 93a at 2953–54.  The Legacy ITSS contract supported DoD OIG's Office of the Chief Information Officer ("OCIO") and its nearly 1,800 users across 65 locations, by providing "network security, infrastructure, enterprise architecture, business system development, unified communications, asset management, project management and budget, and help desk support."  Tab 2 at AR 9.

During the course of the Legacy ITSS contract, the OCIO experienced "several systemic issues that were causing concerns" with the services provided, including inconsistent customer support, regular system outages, and stagnant technology coupled with increasing operational costs.  Tab 49 at AR 1676.  As a result, DoD OIG had an independent organizational assessment completed to examine the overall efficiency of the existing contract and DoD OIG's general IT capabilities in advance of an upcoming recompete, which later became known as the ENCORE III procurement.  Tab 2 at AR 9.  The assessment resulted in a full-scale reorganization of the OCIO, and the development of new goals for the ENCORE III procurement.  Tab 49 at AR 1676–77.  DoD OIG determined that, like the Legacy ITSS, ENCORE III should provide DoD OIG with a "large, overarching concept that addressed all of DoD OIG's IT needs."  Tab 92a at AR 2844 n.2.  However, ENCORE III would be broader, more modernized, and more integrated, with greater support structure that would be independent of DoD OIG's internal ITSS.  *Id.*

In October 2022, the Defense Information Technology Contracting Organization ("DITCO") issued an RFP for ENCORE III as a small business set aside.  Tab 25a at AR 903.  However, one month later, DoD OIG notified DITCO that it would be cancelling the ENCORE III requirement because the "results of the organizational assessment . . . require[d] overall efficiency and structural changes that rendered the planned IT support contract ineffective."  Tab 5 at AR 144.  Instead, in March 2023, the Washington Headquarters Services, Acquisition Directorate ("WHS/AD") of DoD OIG issued a one-year, sole-source bridge contract to incumbent LinTech while the OCIO fully reorganized with new teams, positions, and contractor support requirements.  Tab 13 at AR 372; Tab 49 at AR 1676; Tab 92a at AR 2845.

**B.    Bifurcated Requirements: ITSS2, ITMS, Cybersecurity, and Information Governance**

Following the OCIO's internal reorganization, DoD OIG submitted revised requirements to WHS/AD for procurement, which included several new features, such as "modern cloud-based applications."  Tab 92a at AR 2845.  Most notably, this time DoD OIG "divide[d] the single support contract" into four "smaller, more targeted contracts": ITSS2, information technology management services ("ITMS"), cybersecurity, and information governance.  *Id.*  The latter two requirements, cybersecurity and information governance, were both awarded in September 2023 to a sister company of Suvi, Akima Data Management, LLC ("Akima"), as a set aside under the

SBA's 8(a) program. *Id*. at AR 2846; ECF No. 42 at 4 n.13 (citing *Our Company: Suvi*, AKIMA[1]).

As for the ITSS2 and ITMS requirements, WHS/AD issued Sources Sought Notices ("SSNs") for the requirements as sole-source, direct awards under FAR 6.302-1(a)(2)(iii) in November 2023. Tab 7a at AR 162; Tab 8a at AR 189. The ITSS2 requirement was estimated at a maximum dollar amount of $50 million, whereas the ITMS maximum was estimated at $20 million. Tab 8a at AR 189; Tab 7a at AR 162. Both contracts had an estimated base period of performance of twelve months with four twelve-month option periods. Tab 8a at AR 190; Tab 7a at AR 163. The ITSS2 requirement encompassed data center and cloud engineering support services ("DCCESS"), for which it awarded a bridge contract also in September 2023, to a company named NexTech LinTech LLC, as a one-year bridge and a sole-source, direct award through the 8(a) program. Tab 92a at AR 2841. The ITSS2 and ITMS requirements were submitted to and accepted into the SBA's 8(a) program in 2024. *Id*. at AR 2847; Tab 93a at AR 2954.

The SBA's 8(a) program helps small businesses that are owned and controlled by socially and economically disadvantaged individuals competitively bid for federal procurements. *See* 15 U.S.C. §§ 637(d), 631(f)(2). Although participation in the program does not guarantee contract awards, it gives participants opportunities to receive training specifically designed to help strengthen them to be competitive for procurements. *See 8(a) Business Development Program*, SBA[2] (Feb. 11, 2025). For a requirement to be offered through the SBA's 8(a) program, the contracting agency must offer it through the program and the SBA must accept the requirement for award as an 8(a) contract. 13 C.F.R. §§ 124.501–.504. To facilitate the 8(a) program, the SBA has promulgated guidelines to determine whether certain types of requirements will be accepted into the program. *Id*. One guideline relevant here, 13 C.F.R. § 124.504(a), provides that the SBA will not accept a procurement into the 8(a) program if the requirement was previously solicited as a set aside for small businesses.

In April 2024, WHS/AD completed market research reports following vendor responses to the SSNs. *See* Tab 13; Tab 14. Both Suvi and KL3 responded to the SSNs for the ITSS2 and ITMS requirements. In both market reports, WHS/AD assessed the technical capabilities of 8(a) participants and concluded that Suvi, an 8(a) participant, was capable of performing the requirements. Tab 13 at AR 373, 375; Tab 14 at AR 385. By contrast, WHS/AD determined that KL3, a small business but not an 8(a) program participant, was not capable of performing the ITMS because "their capability statement addressed four (4) out of six (6) critical tasks questions and because their capability didn't demonstrate experience with Data Governance and the creation of Business Intelligence from Data insights." Tab 14 at AR 390. WHS/AD did not review KL3's ITSS capabilities in compiling the report, reviewing only 8(a) participants that responded to the SNN. Tab 13 at AR 373. The OIG thus concluded that the "recommended acquisition strategy" for both the ITSS and ITMS requirements would be to "pursue a sole

---

[1] https://www.akima.com/opcos/suvi/ (last accessed May 30, 2025).
[2] https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

source direct award to Native American–owned business Suvi" through the 8(a) program. *Id.* at AR 381; Tab 14 at AR 393.

## C.    ITSS2 and ITMS Offering Letters and KL3s Protests

In April 2024, WHS/AD submitted a first set of offering letters to the SBA for acceptance of the ITSS2 and ITMS requirements as 8(a), sole-source contracts to be performed by Suvi. Tab 15 at AR 395; Tab 17 at AR 504. Within a day, the SBA issued letters accepting the offer of the requirements for ITSS2 and ITMS on behalf of Suvi. Tab 16 at AR 502–03; Tab 19 at AR 545–46. Three weeks later, on May 3, 2024, prior to award of the contracts, KL3 filed a protest with the Government Accountability Office ("GAO"), challenging the acceptance of ITSS2 and ITMS into the 8(a) program. Tab 25 at AR 889–90. KL3 argued that the SBA had violated 13 C.F.R. § 124.504(a) by accepting ITSS2 and ITMS into the 8(a) program, because the ENCORE III RFP requirements had previously been issued as a small business set aside and WHS/AD had failed to submit complete and accurate offering letters to the SBA by omitting the ENCORE III procurement from the acquisition history. *Id.* at AR 893–94. After Suvi responded and WHS/AD as well as the SBA submitted input to the GAO, KL3 withdrew its protest, and WHS/AD took corrective action by withdrawing the offering letters requesting that the ITSS2 and ITMS requirements be accepted into the 8(a) program. *See* Tab 26; Tab 30; Tab 42; Tab 44; Tab 47.

In August 2024, WHS/AD submitted a second set of offering letters to the SBA for acceptance into the 8(a) program for the ITSS2 and ITMS requirements, which the SBA again accepted on behalf of Suvi. *See* Tab 53 at AR 1847; Tab 54 at AR 1959; Tab 54a at AR 1960; Tab 53a at AR 1848; Tab 55a at AR 2000–01; Tab 55b at AR 2002–03. This time, the ITSS contract had a "corrected" anticipated maximum total value of nearly ▮▮▮▮▮, Tab 53a at AR 1849 n.1, and the ITMS contract had an anticipated maximum total value of roughly ▮▮▮▮▮, Tab 54a at AR 1961. Moreover, both acquisition histories included the ENCORE III history but framed the ITSS2 and ITMS procurements as "new requirements." Tab 53a at AR 1852–54; Tab 54a at AR 1964–66. In July 2024, KL3 again filed a protest, this time with this Court, on the same grounds as its GAO protest, that the ITSS2 and ITMS requirements were improperly admitted into the 8(a) program under 13 C.F.R. § 124.504(a). *See* Tab 58. Again, WHS/AD took corrective action by withdrawing the offering letters, Tab 59, and KL3 voluntarily dismissed the bid protest, Tab 60.

In November 2024, WHS/AD submitted a third and final set of offering letters to the SBA for the ITSS2 and ITMS requirements to be accepted into the 8(a) program, which, for a third time, the SBA accepted on behalf of Suvi. *See* Tab 92; Tab 92a; Tab 93; Tab 93a; Tab 95; Tab 96. Like the second set of offering letters, the anticipated maximum total values remained the same, and the acquisition histories included the ENCORE III procurement. *See* Tab 92a; Tab 93a. In December 2024, KL3 filed the present protest in this Court challenging the procurements on three bases: first, KL3 challenges the acceptance of the ITSS2 and ITMS requirements into the SBA's 8(a) program as violative of FAR 19.804-2 and 13 C.F.R. § 124.402; second, KL3 alleges that the SBA's acceptance of ITSS2 and ITMS into the 8(a) program based on the third set of offering letters was arbitrary and capricious; and finally, KL3 asserts that WHS/AD violated 13 C.F.R. § 124.503(f)(2) by allegedly releasing the performance work statement

("PWS") for each requirement to potential offerors in the form of the "Requirement Tasks" attachments to the first set of RFPs. *See* ECF No. 46. Soon thereafter, KL3 moved for judgment on the administrative record. *See* ECF No. 42. The government and Suvi responded and submitted cross-motions for judgment on the administrative record. *See* ECF No. 47; ECF No. 48. Following briefing and oral argument, the matter is now ripe for consideration.

## DISCUSSION

### A.    Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In such actions, the Court is to "review the agency's decision pursuant to the standards set forth in section 706 of title 5." *Id.* § 1491(b)(4). As such, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To succeed in a bid protest, a protestor must make two showings. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, a protestor must demonstrate error, meaning that the agency violated the standards set forth in section 706 of the Administrative Procedures Act. *Id.* Second, a protestor must prove that such error was prejudicial. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."); *see also Sys. Studies & Simulation, Inc. v. United States*, 22 F.4th 994, 996–97 (Fed. Cir. 2021) ("In particular, the challenger of agency action generally bears the burden of showing that an error was harmful— that is, that it was prejudicial.").

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the U.S. Court of Federal Claims ("RCFC"). RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc.*, 404 F.3d at 1354. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. *See id.* at 1355–56. Rather, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

### B.    Analysis

KL3 asserts that the agency committed three errors in the ITSS2 and ITMS procurements. In order to be permitted to assert that the agency committed these alleged errors, KL3 must first establish that it has standing to raise those errors before this Court. However, beyond a few conclusory allegations in its complaint related to standing, KHI does not plausibly allege that it could compete for the contracts at issue were the alleged procurement errors removed.

6

Moreover, relatedly, even if KL3 had established that it had standing to challenge the alleged procurement errors, KL3 failed to prove on the merits of this protest that any of the alleged errors were prejudicial.  Accordingly, as discussed more fully below, KL3's bid protest fails.

### 1.  KL3 Failed to Demonstrate that It Has Article III Standing

Before the Court may exercise jurisdiction over a case, it must consider whether the plaintiff has established that it has met the constitutional requirements for standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  While the doctrine of standing originates in the text of Article III of the Constitution based on "the traditional understanding of a case or controversy," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), this Court, "though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III," *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (citation omitted).  *See also Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 677 n.5 (2002) (discussing the reasons this Court applies Article III standing requirements).

Supreme Court precedent holds that "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  "To establish standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *Horne v. Flores*, 557 U.S. 433, 445 (2009) (citing *Lujan*, 504 U.S. at 560–61).  In other words, the critical question a plaintiff must answer to establish standing is whether he has "'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction . . . ." *Warth*, 422 U.S. at 498 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962) (emphasis added).  This is because the judicial power "exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.  A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).

"The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]," and if that party fails to prove any of the three elements, there is no case or controversy for the court to decide. *Lujan*, 504 U.S. at 561; *see also Spokeo*, 578 U.S. at 338; *Starr Int'l Co. v. United States*, 856 F.3d 953, 964 (Fed Cir. 2017) ("The plaintiff bears the burden of showing standing . . . .").  Moreover, the requirements to prove standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case" such that "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. . . ." *Id.*  On a motion for summary judgment, "mere allegations" no longer suffice, and the proponent "must 'set forth' by affidavit or other evidence 'specific facts,' which for the purposes of summary judgment motion will be taken as true." *Id.* (quoting Fed. R. Civ. P. 56(e)).  Finally, at the trial stage, those specific facts

must be "supported adequately by the evidence adduced at trial." *Id.* (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)). The issue of standing may be raised at any stage of the litigation, by any party, including the Court *sua sponte. Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003).

In a bid protest, a protestor ordinarily has standing "because it claims an injury, namely rejection of its bid, which is traceable to the allegedly defective procurement process and which could be redressed by this Court." *Barbaricum LLC v. United States*, 172 Fed. Cl. 186, 195 (2024). But in instances in which a protestor did not bid on the underlying contract, the injury-in-fact and the redressability of that injury do not flow directly from the rejection of the non-existent bid. In such cases, it becomes incumbent on the protestor to establish plausibly through the factual allegations in its complaint that it was capable of performing the requirements of the underlying contract. Because if a protestor could not perform that contract, there can be no injury no matter how egregious the agency's alleged error, and the Court cannot provide any redress to an incapable protestor based on any alleged errors.

Here, KL3 failed to plausibly allege that it could compete for either the ENCORE III requirement generally or the ITSS2 or ITMS requirements that it specifically protests here. This failure to plead in a plausible manner that it has Article III standing precludes the Court from exercising jurisdiction over this protest. As the Federal Circuit has held, "the Supreme Court's 'plausibility' requirement for facial challenges to claims under Rule 12(b)(6), as set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1)." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354–55 (Fed. Cir. 2018). Therefore, "'[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter' that would plausibly establish standing if accepted as true." *Id.* at 1355 (quoting *Iqbal*, 556 U.S. at 678) (alterations in original). Accordingly, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678) (second alteration in original). But, as is explained below, threadbare recitals and conclusory statements are all KL3 offers in support of its standing.

### a. KL3 failed to allege that it could compete for the ENCORE III requirement if the alleged procurement errors were removed.

At minimum, for a protestor challenging a sole-source award to have suffered an injury-in-fact, and for that injury to be redressable by a favorable ruling, it must show that it would have been capable of competing for the contract assuming the alleged errors in the procurement process are removed. Without any indication that it could compete for the underlying contract, a protestor cannot have suffered any cognizable injury, since it is effectively a "stranger to the procurement at issue." *Sup. Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 272 n.30 (2024). As the government states plainly, "KL3 is not an ENCORE III contract holder and does not allege or demonstrate that it can or ever will become one." ECF No. 48 at 26. More specifically, the complaint does not contain any plausible allegations that KL3 was capable of competing for the ENCORE III requirement. Nor does anything else in the record before the Court for that matter. Because KL3 does not plausibly allege its capability to perform the contract the award of which it is challenging, KL3 lacks standing.

KL3's protest suffers at the outset from a fatal standing flaw: it is only challenging two components of a four component requirement.  In a nutshell, KL3 alleges that the agency originally competed the ENCORE III requirement as a small business set aside, but then canceled the ENCORE III requirement and impermissibly divided and awarded the four parts of the ENCORE III requirement to two different 8(a) businesses.  Such a challenge could potentially be justiciable if KL3 had plausibly alleged that it was capable of performing the entire ENCORE III requirement and had challenged the award of the two other parts of the ENCORE III requirement.  An agency is not able to avoid the proscription in 13 C.F.R. § 124.504—that the "SBA will not accept a procurement for award as an 8(a) contract" if the agency previously "issued a solicitation for or otherwise expressed publicly a clear intent to award the contract as a small business set-aside"—by simply dividing the previously solicited contract up into smaller pieces.  Therefore, a small business that was interested in competing for the previously solicited ENCORE III requirement (that was also capable of performing the ENCORE III requirement) would have standing to challenge the re-solicitation of its constituent parts.  Here, however, KL3 raises a challenge to only two of the four constituent parts into which ENCORE III was allegedly divided.  ECF No. 42 at 1.  At no time during this protest has KL3 objected to the cybersecurity and information governance awards to Akima.  *Id.* at 36 (discussing only the fact that Akima is a sister company of Suvi, which means that the "sister companies [] were selected for award of all of ENCORE III's bifurcated requirements" (emphasis omitted)).  Nor does the record indicate that KL3 protested the 8(a) awards of the cybersecurity and information governance contracts.  More importantly, neither the complaint nor the record indicates that KL3 was interested in or even capable of performing the entire ENCORE III contract, including the cybersecurity and information governance requirements.

Instead, KL3's protest only challenges two of the "bifurcated requirements."  But in order to have an injury-in-fact that is also redressable, KL3 would need to be capable of performing ENCORE III.  KL3, however, makes no allegations, plausible or implausible, regarding its capability or even interest in ENCORE III.  That is to say, with respect to the ENCORE III requirements, KL3 does not even make "[t]hreadbare recitals" of the requisite elements of standing, "supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  Thus, even if the Court were to agree with KL3 regarding the errors it alleges and find that the agency was prohibited from dividing ENCORE III and setting its parts aside for 8(a) businesses, this finding (at least based on the lack of allegations in the complaint) would provide KL3 no relief because KL3 has not suffered an injury-in-fact.

Beyond the problem that KL3 fails to allege injury, KL3's conclusory allegations also do not support redressability.  In analyzing redressability, the Court must "consider the relationship between 'the judicial relief requested' and the 'injury' suffered."  *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)).  Even if the Court concurred with all of the errors that KL3 alleges, the alleged injury suffered—the illegal re-solicitation of the ENCORE III requirements as 8(a) set asides—is not redressable in the protest that KL3 brings.  By mounting a challenge to only the ITSS2 and ITMS requirements, KL3 has brought a case that would not permit the Court to reassemble ENCORE III without impermissibly enjoining two procurements not before it.  As such, the Court could not redress the injury caused by the alleged violation of 13 C.F.R. § 124.504 (even if KL3 had properly

alleged an injury-in-fact) because KL3 has not put ENCORE III in toto—to which KL3 has expressed no interest in competing—before the Court.

At bottom, KL3 has a simple math problem: one plus one cannot equal four. KL3's protest of the ITSS2 and ITMS awards arise out of the proposition that Defense Department impermissibly offered the ITSS2 and ITMS requirements as sole-source direct awards through the SBA's 8(a) program because the ENCORE III procurement was previously solicited in an RFP set aside for small businesses. ECF No. 42 at 6–11. This argument rests on the theory that the "previously solicited" requirement, ENCORE III, is synonymous with the four parts it was divided into, which were each treated as "new" rather than "follow-on" requirements, and which were thus improperly accepted into the 8(a) program. *Id.* at 34–36. However, in the instant protest, KL3's math does not add up. KL3 fails to challenge, or even express any interest in, two of the four pieces of the ENCORE III solicitation, namely the cybersecurity and information governance solicitations that were awarded to Akima. Even looking at the problem in reverse, KL3 fails to allege that, if the ITSS2 and ITMS contracts amounted to "follow-on" requirements to the ENCORE III contract, it would have been capable of or even interested in bidding on the ENCORE III contract. Because of these failures, KL3 lacks standing.

> **b. Even if the Court accepts KL3's argument that the relevant requirements are ITSS2 and ITMS, KL3 has still not plausibly alleged that it has standing.**

As discussed above, KL3 does not even attempt to address its standing with regard to ENCORE III. Rather, its focus is solely on two of the components of ENCORE III: ITSS2 and ITMS. But even with regard to ITSS2 and ITMS, KL3's complaint fails to plausibly allege that it is capable of performing the requirements and, therefore, that it has standing. If KL3 cannot perform the requirements that it is challenging, it has no personal stake in this protest. To have standing, though, KL3's "complaint must establish that [it] has a 'personal stake' in the alleged dispute . . . ." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk. U. L. Rev. 881, 882 (1983)). KL3 fails to answer this question.

Instead, in rote fashion, KL3 simply recites the conclusion that it meets the legal standard for standing in a bid protest[3]:

> KL3 has standing to pursue this protest because it is an interested party. *See* 28 U.S.C. § 1491(b)(1). . . . But for any of the errors raised [in this complaint], there is a substantial chance that DoD would have been required to procure ITSS2 and ITMS, or at the very least ITSS2, on a competitive basis as a small business

---

[3] This fill-in-the-blank recitation that KL3 offers in its complaint to attempt to establish standing is pegged to the test for statutory standing; a test that is "more stringent" than that for Article III. *See Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1319 (Fed. Cir. 2025). As KL3 fails to meet the less stringent standard for Article III standing, the Court need not address KL3's failure to plausibly allege statutory standing.

set-aside.  KL3, a small business that is qualified to perform the services, would be a prospective offeror if DoD were required to award the contract(s) through a competitive bidding process, and KL3 could complete for contract(s) if the contracts were competitively procured.  Accordingly, KL3 is an interested party and has standing to file this protest.

ECF No. 46 ¶¶ 10–11.  Several times in its complaint, KL3 also repeats the even more threadbare assertion that but for the alleged errors, "there is a substantial chance that KL3 would have been able to compete in the procurement and be awarded a contract."  *See, e.g.*, *id.* ¶¶ 5, 107, 113, 116, 118.  KL3 additionally states in an equally conclusory fashion that "KL3 submitted responses to the ITSS2 and ITMS SSNs, confirming its willingness to compete for these requirements . . . ."  *Id.* ¶ 118.  Beyond these threadbare assertions, none of the factual allegations in KL3's complaint in any way address KL3's ability to perform the requirements at issue or otherwise address standing.

Likewise, in its motion for judgment on the administrative record, KL3 simply states: "But for [the alleged] errors, the ITSS2 and ITMS representations would not have been accepted into the 8(a) program.  Instead, WHS/AD would have procured the ITSS2 and ITMS requirements outside of the 8(a) program.  Under such circumstances, there is a substantial chance KL3 would have been eligible to compete for, and awarded, contracts for the requirements."  ECF No. 42 at 1; *see also id.* at 34, 38.  KL3 repeats this refrain throughout its motion and reply, not once citing to any "specific facts," set forth "by affidavit or other evidence," nor does it support any such facts "adequately by the evidence adduced" from the record.  *Lujan*, 504 U.S. at 561 (quoting *Gladstone*, 441 U.S. at 115 n.31); *see also Bannum*, 404 F.3d at 1356 (holding that motions for judgment on the administrative record are the equivalent of an expedited trial on a paper record).

As the "party invoking federal jurisdiction," KL3 "bears the burden of establishing [the] elements" of standing, but KL3 does not offer any actual factual allegations in support of its naked conclusions that it has standing to bring this bid protest.  *Id.*  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  Thus, the Court need not accept as true "a legal conclusion couched as a factual allegation" or a "'naked assertion[]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Nor must the Court "accept inferences that are unsupported by the facts set out in the complaint . . . ."  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007).  Accordingly, once KL3's "mere conclusory statements" are set aside, its complaint must contain "sufficient factual matter, accepted as true," to support an inference of standing "that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  KL3 must have alleged "more than a sheer possibility" that it has standing to bring this bid protest.  *Id.*  Thus, a complaint that "pleads facts that are 'merely consistent with'" the plaintiff's theory of standing "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

Here, all the Court has to judge KL3's standing are the assertions that KL3 is "qualified to perform the services," "would be a prospective offeror," and that "KL3 could complete for contract(s)."  ECF No. 46 ¶ 11.  These are all conclusions unsupported by *any* factual allegations

in the complaint.  In some bid protests, bare conclusory statements regarding a protestor's capability to perform the contract at issue may be sufficient because, for example, the complaint may contain allegations that the agency in question evaluated the protestor's proposal and determined that the protestor was eligible for award, or the agency's evaluation or best value trade-off is attached to the complaint as an exhibit.  But this was a sole-source award—and other than determining that KL3 was not capable of performing the ITMS requirement in response to an SSN (which clearly does not help KL3's efforts to establish standing), Tab 14 at AR 390—the agency has not evaluated whether KL3 is capable of performing the ITSS2 or ITMS requirements.  And obviously, nor did KL3 submit a proposal for either requirement.  Thus, it was incumbent on KL3 to make factual allegations in its complaint that plausibly stated its capability to perform these requirements.  Protestors of sole-source awards or of procurements for which they did not or have not yet submitted a proposal routinely make such allegations in their complaints.  Sometimes these allegations do not need to be particularly detailed to reach the plausibility threshold.  For instance, in the case of the incumbent contractor protesting a sole-source award of a follow-on requirement to a different contractor, the mere allegation of incumbency and that the follow-on requirement is the same or substantially similar to its work as the incumbent may be enough.  But KL3 alleged *nothing* regarding its capabilities to perform either requirement at issue.

Accordingly, even if the Court were to grant KL3 the relief sought in its complaint—that the agency must terminate its sole-source contract awarded to Suvi and, on a competitive basis as a small business set-aside, compete the ITSS2 and ITMS requirements—based on the lack of plausible allegations in its complaint, KL3 may not even have the capability to perform the requirements.  In other words, regardless of whether KL3 were to win or lose this bid protest, the complaint gives no plausible inference that KL3 could bid on or compete for the ITSS2 and ITMS requirements.  But, in contracting cases, the Supreme Court has held that "[t]o establish standing," a plaintiff must, *inter alia*, "demonstrate that it is able and ready to bid on contracts." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  Without plausibly alleging that it can perform the requirements at issue, KL3 fails to establish that it has been affected "in a personal and individual way" by the errors in the procurement process that it alleges.  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  But for KL3 to have suffered an injury-in-fact, that is exactly what it must have alleged.

At oral argument, KL3 made one last gasp at attempting to establish it has standing—with its counsel asking the Court why it would bring this protest if it could not perform the requirements at issue.  Oral argument at 2:48:46–49:01.  Leaving aside the circularity of the argument behind this question (that KL3 must have suffered an injury-in-fact, because it would only bring suit if it suffered an injury-in-fact), the Court sees a clear possible answer to KL3's inquiry that has nothing to do with standing.  Because LinTech, a joint partner and mentor to KL3, is currently performing the bridge contract for DoD OIG's IT requirements, ECF No. 42 at 39; ECF No. 46 ¶ 6, the longer this procurement is delayed by the bid protest process, the longer LinTech gets to perform the bridge contract.  The Court has no indication that this is the reason this protest was brought, but it is nonetheless a simple answer to KL3's final attempt to argue in favor of standing.

In sum, like the shortcomings of its arguments with respect to ENCORE III, KL3 has failed to plausibly allege that it was actually capable of completing the ITSS2 and ITMS requirements. Therefore, KL3 has failed to establish that it has suffered an injury-in-fact that could be redressed by a favorable ruling from the Court, and KL3's protest must be dismissed.

**2.  KL3 Failed to Prove Prejudice.**

Even if KL3 had plausibly alleged in its complaint that it had standing to pursue this bid protest, KL3 has failed to prove on the merits that it was prejudiced by the errors it alleges. *See Sys. Stud.*, 22 F.4th at 996–97 ("In particular, the challenger of agency action generally bears the burden of showing that an error was harmful—that is, that it was prejudicial."). Ordinarily, the Court's determination that KL3 lacks Article III standing would be the end of the Court's opinion. Here, however, a further discussion of KL3's failure to prove prejudice on the merits serves to amplify KL3's standing issues. Accordingly, the Court will engage in a brief discussion of the lack of proof regarding merits prejudice in this case.

In a bid protest, a protestor must demonstrate that the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law *and*, if so, [that] the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (emphasis added). Put differently, "error alone is not enough; prejudicial error to the protestor is required to set aside an award." *Acuity Edge, Inc. v. United States*, 174 Fed. Cl. 46, 55 (2024) (citing *Glenn Def. Marine*, 720 F.3d at 908); *see also Statistica, Inc. v Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("A protester must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest."); *Bannum*, 404 F.3d at 1353 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced [the protestor]."). As the Federal Circuit has stated unequivocally, "there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard." *Sys. Stud.*, 22 F.4th at 998.

In many protests, the Court will first analyze whether a protestor has proved that an agency committed error before turning to the question of prejudice. KL3's failure with regard to proving prejudice, however, is so glaring that there is no reason for the Court to engage in the first step of the analysis. Throughout its motion for judgment on the administrative record, KL3 does nothing more than baldly assert that it was capable of performing and, but for the alleged errors, would have been awarded a contract. *See, e.g.*, ECF No. 42 at 34 (arguing that, had the requirements not been accepted into the 8(a) program, "KL3 would have been able to compete in the procurement and be awarded a contract," with no citation), 36–37 (asserting that had the requirements not been accepted into the 8(a) program, "there is a substantial chance that KL3 would have been eligible to compete and been awarded a contract," with no citation), 38 (stating that KL3 "would have been eligible to compete for, and be awarded, the ITSS2 and ITMS contracts," with no citation). Simply reiterating the legal conclusion that, but for the alleged errors, it would have had a substantial chance at being awarded the contracts is insufficient to prove prejudice on the merits in all but the most obvious cases of prejudicial error. *See id.* at 34, 38, 39, 1. This is especially so where the procurement at issue is a sole-source award, because the protestor has not submitted a proposal to the agency explaining its capability and

concordantly the agency has not evaluated the protestor's capabilities to perform the contract. In such instances, it is incumbent on the protestor to offer some evidence that it is actually capable of performing the contract in question. Here, KL3 offers the Court nothing whatsoever to even try to meet its burden to prove it is capable of performing the ITSS2 and ITMS requirements.

Instead, the parties begin their dispute regarding prejudice by debating which test for prejudice applies: whether KL3 must prove it suffered a "non-trivial competitive injury" or that it had a "substantial chance" of receiving the contract award.[4]  *See* ECF No. 42 at 33, 36; ECF No. 48 at 10, 25–26; ECF No. 49 at 28; ECF No. 51 at 11–15; ECF No. 47 at 44–46. The Court need not resolve this debate, as KL3's prejudice claim fails under either the "non-trivial competitive injury" or "substantial chance" test. Because KL3 simply asserts that a "non-trivial competitive injury" occurred and that "KL3 has met its burden" without any underlying support or citation to anything in the record, the Court cannot discern what effect, if any, the alleged errors might have had on KL3 and whether those errors caused prejudice under either test. *See, e.g.*, ECF No. 49 at 23.

As the government points out, "KL3's claim of prejudice is purely speculative—the Administrative Record evinces no reason to think that KL3 would automatically be an eligible offeror even if [the agency] were forced to procure the requirements outside the 8(a) program." ECF No. 48 at 25. Furthermore, the government argues, "[n]or has KL3 alleged or attempted to prove it is even capable of performing either requirement." *Id.* at 26. Nowhere in KL3's reply brief does it address the government's assertions that KL3 failed to allege or prove that it was capable of performing the ITSS2 and ITMS requirements. Failure to attempt to prove it was prejudiced in its opening brief and, moreover, to respond to the government in its reply brief, is fatal to KL3's protest. To begin with, arguments a plaintiff fails to pursue in its opening brief are waived. *See Webco Lumber, Inc. v. United States*, 230 Ct. Cl. 457, 465 (1982) (holding that an allegation not argued in a plaintiff's brief was abandoned and therefore waived); *Ulman v. United States*, 214 Ct. Cl. 308, 314 (1977) (finding that a plaintiff's failure to raise claims in his motion for summary judgment amounted to abandonment and dismissing the allegations). Additionally, "failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *Cap Exp., LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed. Cir. 2018) (quoting *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011)). Moreover, raising an issue for the first time in a reply brief is insufficient, as reply briefs are not a "new opportunity to present yet another issue for the court's consideration." *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

The closest KL3 comes to rebutting the government's arguments is in its reply, in which it argues the following: "Notwithstanding WHS/AD's evaluation of KL3's informal SSN response, KL3 has demonstrated its interest in competing for award, and its joint venture partner is currently performing the existing ITSS2, ITMS, and DCCESS requirements." ECF No. 49 at

---

[4] Notably, KL3 itself cannot decide which test applies, alternating interchangeably between the "substantial chance" and "non-trivial injury" tests. *Compare* ECF No. 42 at 33, 38 (applying the substantial chance test), *with* ECF No. 49 at 22–23, 27–28 (applying the non-trivial injury test).

23–24. In other words, KL3 states that it is interested in competing and implies capability by way of its joint venture partner, LinTech. There are several issues with this argument. First, both clauses of the sentence are conclusory. While they may make a good introduction to an argument that KL3 was prejudiced because it was capable of performing the requirements, they are wholly insufficient to prove on the merits that KL3 is capable of performing and is, therefore, prejudiced by any errors in the procurement process. Second, the record shows that "WHS/AD did not determine KL3 to be capable of performing ITSS[2] and affirmatively determined KL3 *not* capable of performing ITMS." ECF No. 48 at 26 (emphasis in original) (citing Tab 13 at AR 373; Tab 14 at AR 390). Although an agency's determination in a market research report is not dispositive, that is the only evidence in the record the Court has before it regarding KL3's capability—KL3 failed to address it, much less refute it. *See* Tab 13; Tab 14.

Third, KL3 cannot rely on one joint venture partner in the SBA's mentor-protégé program, LinTech, as the basis for its capability. Although an SBA mentor, like LinTech, may help "enhance the capabilities of protégé firms" through "business development assistance" to help them "successfully compete for federal contracts," the protégé may not entirely impute a mentor's capabilities to itself. 13 C.F.R. § 125.9(a). Specifically, under 13 C.F.R. § 125.8(c)(1), "the small business partner must perform at least 40% of the work performed by the joint venture." Thus, whatever capabilities LinTech may have in performing the Legacy ITSS contract or the bridge contract cannot be fully imputed to KL3. Moreover, even if LinTech's capabilities for the remaining sixty percent of the work performed by the joint venture were fully imputed to KL3, the weight of the evidence would still be on the government's side, as LinTech's performance of the Legacy IT contract has been characterized by the agency as unsatisfying, problematic, and inconsistent. *See* Tab 49 at AR 1676 ("Internal OIG customers were not satisfied with the level of service being provided by the OCIO; customer support wasn't consistent, and processes regularly failed; there were regular IT system outages; and, the OIG couldn't communicate effectively with the Department because they had already moved their collaboration services to Microsoft 365 in the cloud. Technology was stagnant, yet at the same time, IT operational costs continued to increase.").

Fourth, KL3 offers no support for its claim that the existing requirement that LinTech is performing is analogous or otherwise related to the ITSS2 and ITMS requirements. The only evidence KL3 cites to in its briefs to support the claim that LinTech "is currently performing the existing ITSS2, ITMS, and DCCESS requirements" is one citation to Tab 11 and one citation to Tab 92a, neither of which support this proposition. ECF No. 49 at 24 n.84.

To begin with, Tab 11, the bridge contract with LinTech, does nothing to show that LinTech is performing the "existing ITSS2, ITMS, and DCCESS requirements." KL3 might have met its burden by supplementing the basic bridge contract with, for example, a PWS for the bridge contract or by putting forward any other evidence to show that there is any alignment of expectations between the bridge contract requirements and the ITSS2 and ITMS requirements. What Tab 11 does show is simply that LinTech is performing ITSS services, for which it is paid $33,148.62 per day over the course of 150 days, for a total of $4.97 million. *Id.* at AR 344. This contract amounts to approximately $8.61 million per year, if the daily rate is multiplied by the number of business days in a year, which amounts to $43 million over a hypothetical term of five years. As compared to the ITSS2 and ITSM requirements, which would be performed over five

15

years, KL3 alleges that Suvi stands to receive over ▨▨▨▨▨▨. *See* ECF No. 46 ¶ 118 (estimating the ITSS2 and ITMS SSNs "at approximately ▨▨▨▨▨▨ and ▨▨▨▨▨▨, respectively"). Given that KL3 has not put forth any evidence of the responsibilities or requirements under the bridge contract, the Court is left with just a few numbers, and some basic, back-of-the-napkin math shows that the contract values do not equate. Rather, they indicate that, at least based on cost, the bridge contract constitutes less than 50 percent of the work of the contracts at issue here. With KL3 offering no evidence whatsoever to the contrary (whether from the administrative record or even a declaration or affidavit from a knowledgeable individual), the Court must presume, based on what little evidence it has, that the awarded ITSS and ITMS contracts are likely not for the same services as LinTech is providing under the bridge contract.

Likewise, Tab 92a, the second offering letter for the ITSS requirement, reads as follows: "Currently, DoD OIG is receiving IT service support under a Bridge Contract . . . that was awarded to LinTech Global Inc. (a large business) on March 28, 2024, for a price of $1,494,688.00." Tab 92a at AR 2841. It continues that "this ITSS requirement includes [DCCESS] . . . that DoD OIG is currently receiving under [a] bridge Task Order . . . to NexTech LinTech LLC for a price of $3,775,910.40 [as a] . . . sole source 8(a) direct award, made by WHS/AD under the 8(a) STARS III contract . . . ." *Id.* Although LinTech, the mentor in the KL3 joint venture, is performing the bridge contract, clearly NexTech LinTech LLC ("NexTech"), a small business and 8(a) participant, is performing the DCCESS requirements, which are part of the ITSS2 contract but separate from the bridge contract. There is nothing in the record to indicate the extent to which LinTech, NexTech, and KL3 are entwined, and what, if any, capabilities KL3 may impute to itself either from LinTech or NexTech. Therefore, the statement that LinTech is performing "the existing ITSS2, ITMS, and DCCESS requirements" is not supported by the information contained in Tab 92a.

Finally, it is also worth noting, although not dispositive, that LinTech is a partner in multiple joint ventures that responded to the ITSS2 and ITMS SSNs. A joint venture named CCS Lintech, LLC ("CCS Lintech") responded to both SSNs. Regarding the ITMS requirements, CCS LinTech was "deemed not capable" and, unlike KL3, was also evaluated and "deemed not capable" of performing the ITSS2 requirements. Tab 14 at AR 389; Tab 13 at AR 377. It is unclear from the record what exactly LinTech's relationship is with CCS Lintech. However, under 13 C.F.R. § 125.9(b)(3)(i), "[a] mentor that has more than one protégé cannot submit competing offers in response to a solicitation for a specific procurement through separate joint ventures with different protégés." There is no indication in the record, nor did KL3 offer any evidence or seek to supplement the administrative record with material to indicate, whether LinTech would have continued to support KL3, and not CCS Lintech, as a prospective bidder if the contracts at issue here were opened up to competitive bidding as a small business set aside. What is more, the evaluations in the administrative record indicate that a different joint venture that includes LinTech is not capable of performing either the ITSS2 or the ITMS requirements. Recall that KL3's only assertion in response to the government's no prejudice argument is that "its joint venture partner[, LinTech,] is currently performing the existing ITSS2, ITMS, and DCCESS requirements." This statement carries little weight regarding KL3's capability to perform these requirements considering that another LinTech joint venture was determined to be not capable of performing the requirements at issue according to the agency.

Ultimately, KL3 has not made the requisite showing that even if it had standing and even if it had proved that the award of the contracts was irrational, it would have been prejudiced by the alleged errors in the procurement process. A motion for judgment on the administrative record is founded on the premise that a protestor will draw on the administrative record before the Court and apply reasoning and analysis rather than offering unsupported assertions or unsubstantiated conclusions. *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 294–95 (2022). Lacking facts to support its assertions or citations to the record to substantiate its conclusions, KL3 fails to prove prejudice.

## CONCLUSION

For the reasons set forth above, KL3 has failed to establish that it has standing to bring the instant protest. As such, KL3's complaint is dismissed, and the Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.


s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge